# STATE OF MICHIGAN

# COURT OF APPEALS

ARTHUR CHAPMAN,

Plaintiff-Appellee,

v

OFFICER D. MACK,

Defendant-Appellant.

UNPUBLISHED
June 19, 2018

No.   335678
Wayne Circuit Court
LC No.   15-010270-NO

Before:  BORRELLO, P.J., and SHAPIRO and TUKEL, JJ.

PER CURIAM.

In this governmental tort liability action, defendant appeals as of right the trial court's order denying his motion for summary disposition. For the reasons set forth in this opinion, we reverse the trial court's order and remand this matter for entry of an order granting summary disposition in defendant's favor.

## I.  BACKGROUND

This case arises out of a traffic stop that culminated in plaintiff's arrest for reckless driving and the subsequent dismissal of the charges against plaintiff when it was determined that defendant stopped the wrong vehicle. On May 8, 2015, defendant, a police officer with the Allen Park Police Department, was parked in his police vehicle on I-94, facing west and watching eastbound traffic. At some point, he saw a vehicle that his radar confirmed was traveling at 91 miles per hour, even though the speed limit in the area was 70 miles per hour. According to defendant's police report for this incident, which he testified that he wrote immediately following plaintiff's arrest, defendant then "pulled out after the suspect vehicle and observed it to be a Dodge Challenger with a personalized license plate SHAKAZ." Defendant further wrote in his police report that he immediately saw the vehicle accelerate into the right lane and swerve onto the right shoulder to pass two cars, after which it "shot across all lanes of traffic to the far left shoulder and drove the shoulder to pass several vehicles." Defendant also indicated that the "suspect vehicle was traveling at least 90 to 100+ MPH weaving in and out of traffic not signaling any of the lane changes."

Defendant caught up to a Dodge Challenger and stopped it after it passed Michigan Avenue where traffic had slowed down. Plaintiff was driving the vehicle that defendant stopped, which had the word "SHAKAZ" on the license plate. Defendant arrested plaintiff for reckless driving and placed plaintiff in handcuffs, which defendant "double-locked" in order to prevent

-1-

them from tightening further once in place. Defendant testified during his deposition that plaintiff never complained about the handcuffs being too tight or any injury to his wrists. According to the police report and defendant's deposition testimony, plaintiff stated that he had used the shoulder to pass slower cars and did not deny driving recklessly. Defendant concluded that plaintiff's statements meant that he was admitting to driving in the reckless manner that defendant had observed.

Plaintiff testified during his deposition that on the afternoon of May 8, 2015, he was driving his black, 2010 Dodge Challenger to pick up his great uncle, Melvin Chapman, from Melvin's home in Detroit to take him to the airport. Plaintiff's Challenger had a personalized license plate that said "SHAKAZ." He was traveling on I-94 and did not recall ever exceeding the 70 mile-per-hour speed limit. According to plaintiff, he passed an Allen Park Police Department vehicle parked in the median. Subsequently, he encountered stop-and-go traffic around the Michigan Avenue exit. Plaintiff called Melvin and told him that he would be there shortly. Plaintiff was in the far right lane when he made the phone call. In his rearview mirror, plaintiff saw a police vehicle with its lights on "probably several hundred yards behind" him. Plaintiff thought that the slow traffic was being caused by an accident, and he moved over to let the police vehicle pass. However, the police vehicle stayed behind plaintiff, and plaintiff heard a voice over the loudspeaker say, "Cut the car off and drop the keys out of the window." Plaintiff was unaware that defendant was speaking to him until defendant repeated these instructions. Plaintiff testified that he had trouble getting his keys out of his pocket right away, and he turned off his car and dropped the keys out of the window after defendant repeated his instructions for the third time. Plaintiff then grabbed his "steering wheel at ten and two immediately after dropping the keys out of the window."

Plaintiff testified that when defendant came up to plaintiff's vehicle, defendant reached in through plaintiff's open driver's side window, pulled the door open, and told plaintiff to get out of the vehicle. Plaintiff told defendant that he had a CPL and that his weapon was under the seat. Defendant repeated his instruction for plaintiff to get out of his car, to which plaintiff responded by repeating that his firearm was under the seat. Defendant repeated his instruction a third time. Plaintiff kept his hands on the steering wheel and informed defendant that his seatbelt was still buckled and that he needed to undo it in order to get out of his car. According to plaintiff, defendant said, "Don't reach for your gun and I won't have to shoot you." Plaintiff, believing that defendant would think he was reaching for his gun if he attempted to unbuckle his seatbelt, told defendant that he would not take off his seatbelt and that defendant would have to do it if he wanted plaintiff to get out. Defendant refused and again ordered plaintiff out of the car. Plaintiff informed defendant that he would remove his seatbelt, and plaintiff slowly did so. Plaintiff testified that after he removed his seatbelt, defendant grabbed him out of the car very quickly under his left arm, put his hands behind his back, spun him around, and put him in handcuffs. Plaintiff testified that it was "a rough experience." Defendant informed plaintiff that he was under arrest for reckless driving.

Plaintiff further testified as follows:

And [defendant] kept saying, "You saw me. If you would've gone another 50 feet I'd be getting you for felony fleeing." And I said, "Officer, you haven't even asked me my name. How are you taking me to jail? This is—you know, I've

never been arrested." He said, "You're going to jail today." So, he put me in the back of the police car, and he sat in the front seat. And I said, "Officer, what's going on? I've never been arrested. How are you taking me to jail?" He didn't respond. He radioed, "Got one for reckless. We need a tow truck." I said, "A tow truck? There's got to be something we can work out. How are you taking me to jail?" And he said, "It was just a speeding ticket, but you drove the shoulder, so now you're going to jail." And I said, "Officer, I did not drive the shoulder. What are you talking about?" And we went back and forth. And I asked him to define the shoulder because I said, "There's no way I drove the shoulder. If I drove the shoulder, it's because you're calling something the shoulder that I never knew was the shoulder." I mean, I told him over and over again, "There's no way I drove the shoulder." And he said, "You saw me. You kept going. You sped up."

Additionally, plaintiff testified that he complained to defendant about the handcuffs being too tight and asked defendant to remove them. Plaintiff further testified that he did not resist and did not know if the handcuffs were double-locked. Plaintiff claimed that he experienced numbness in his fingers and soreness in his wrists for a few days, but he never sought medical treatment for his wrists. According to plaintiff, defendant told him that he would not remove the handcuffs because plaintiff had a weapon.

Defendant subsequently learned that he had arrested the wrong person. On May 11, 2015, Lieutenant David Williams received information about a dashboard camera video that had been posted online and showed the events of May 8, 2015. On May 12, 2015, the individual who had recorded the video spoke with Lieutenant Williams at the police station and gave him the video and pictures he had taken. The video shows a dark-colored car passing the vehicle with the dashboard camera on the right and traveling at high speed. Plaintiff identified this vehicle in the video as a 2015 Dodge Challenger during his deposition, but he testified that it was gray in color. The video also shows a police vehicle subsequently passing the vehicle with the dashboard camera on the left, and further down the road, the video depicts the police vehicle on the right shoulder with plaintiff's Dodge Challenger. Lieutenant Williams reviewed the video and pictures, and he determined that defendant had made a mistake. Plaintiff was informed that the charges against him were being dismissed.

Lieutenant Williams interviewed defendant as part of an internal investigation. Defendant indicated that he had observed a black Dodge Charger go through his radar zone at 91 miles per hour in the center lane, passing other vehicles. Defendant further indicated that he had to wait for traffic to clear before he could pull out onto the highway, that he had eye contact with the vehicle, and that he saw only the "back of the car and dust." Defendant also acknowledged that he lost sight of the speeding vehicle for a period of time while he was waiting to pull onto the highway. Lieutenant Williams noted in his report that defendant's police report narrative did not indicate that he ever lost sight of the vehicle. Defendant further stated during his interview with Lieutenant Williams that he regained sight of what he thought was the speeding vehicle just past the Michigan Avenue exit and saw this vehicle driving at approximately 30 miles per hour on the shoulder of the road as it passed vehicles that were stopped or driving slowly due to traffic congestion. Defendant stopped this vehicle and arrested plaintiff for reckless driving. Defendant indicated to Lieutenant Williams that he told plaintiff about his observations that constituted

reckless driving, that plaintiff responded by saying that he was only passing slow cars, and that defendant did not deny that he had been speeding when defendant informed him of his previous observation of speeds exceeding 90 miles per hour.

When Lieutenant Williams asked defendant why he had written in his report that he pulled out after the suspect vehicle and saw the SHAKAZ license plate, defendant responded that he did not think he actually saw the plate and that he must have seen the personalized plate when plaintiff passed and "tied the two together." Defendant further explained during his deposition that two Dodge Challengers passed him that day, that he observed the license plate of the first Challenger that passed him, that this plate was the personalized license plate, and that he "tied the two Dodge Challengers together" that day. Defendant testified that at the time he wrote his police report, he thought that his statement about the SHAKAZ license plate was the truth, and he believed that plaintiff was the driver of the car that he had seen traveling 91 miles per hour. Defendant testified that he believed at the time that he made the arrest and wrote the police report that he had stopped the correct vehicle and arrested the right person. He did not have any doubt in his mind at the time. Defendant further testified that he did not intentionally lie in his police report. Defendant could not see who was driving the vehicle that he pulled over when activated his lights to stop the vehicle that day or when he ordered the driver to drop the keys out of the vehicle. However, defendant admitted during his deposition that he knew after having reviewed the dashboard camera video that he had made a mistake and arrested the wrong person.

On August 5, 2015, plaintiff initiated the instant lawsuit against defendant by filing a complaint in which he asserted counts of gross negligence, "assault and battery and false arrest," and intentional infliction of emotional distress. Defendant subsequently moved for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10), arguing as pertinent to the issues raised on appeal that plaintiff failed to state a claim upon which relief could be granted with respect to his gross negligence claim because it was "premised upon the same set of factual allegations advanced in support of his intentional tort claims" and that plaintiff's intentional tort claims were barred by governmental immunity. More specifically, defendant argued that he honestly believed at the time of plaintiff's arrest that he had probable cause to arrest plaintiff for reckless driving based on his observation of a dark colored Dodge Challenger driving 91 miles per hour and weaving in and out of traffic, and defendant further argued that he believed without a doubt at the time of the arrest that had arrested the right person. Additionally, defendant argued that his decision to arrest plaintiff was a discretionary one that was based on plaintiff's failure to comply with repeated instructions to drop his keys and the knowledge that plaintiff had a weapon.

Plaintiff opposed the motion for summary disposition, arguing that defendant did not act in good faith because he "fabricated" claims (1) about seeing the speeder's license plate when he entered the highway, (2) maintaining eye contact with the speeding vehicle, and (3) plaintiff admitting to reckless driving. Plaintiff further argued that once defendant lost sight of the speeding vehicle for a significant distance, he could not have established probable cause to stop plaintiff's vehicle merely based on its similar appearance to the speeding vehicle. Additionally, plaintiff argued that defendant's misstatements and misinformation about plaintiff's driving were grossly negligent and that Michigan Courts have recognized gross negligence claims based on excessive tightness of handcuffs causing physical injury.

The trial court held a hearing on defendant's motion, during which it heard oral argument and concluded the hearing with the following statement:

> Well, I'm inclined to deny the motion. The pleadings here were pretty good. We'll look at that and take it under advisement for the time being. We'll resolve this matter by the end of the day.

The trial court entered an order denying defendant's motion for summary disposition without providing any explanation its reasoning, and this appeal followed. The question presented on appeal is whether plaintiff's claims were barred by governmental immunity.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). Our Supreme Court has summarized the applicable standard of review under MCR 2.116(C)(7) and (10) as follows:

> Under MCR 2.116(C)(7), the moving party is entitled to summary disposition if the plaintiff's claims are " 'barred because of immunity granted by law . . . .' " The moving party may support its motion for summary disposition under MCR 2.116(C)(7) with "affidavits, depositions, admissions, or other documentary evidence," the substance of which would be admissible at trial. "The contents of the complaint are accepted as true unless contradicted" by the evidence provided.
>
> In relation to a motion under MCR 2.116(C)(10), we similarly review "the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party. Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." [*Odom*, 482 Mich at 466-467 (citations omitted).]

With respect to MCR 2.116(C)(8), a motion under this subrule "tests the legal sufficiency of the complaint on the basis of the pleadings alone to determine if the opposing party has stated a claim for which relief can be granted." *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013) (quotation marks and citation omitted). Summary disposition should only be granted pursuant to MCR 2.116(C)(8) "if no factual development could possibly justify recovery." *Id.*

To the extent that we consider material outside the pleadings in analyzing plaintiff's intentional tort claims below, MCR 2.116(8) is not applicable and we proceed under MCR 2.116(C)(7) and (10). See *Zaher*, 300 Mich App at 139; see also *Hughes v Region VII Area Agency on Aging*, 277 Mich App 268, 273; 744 NW2d 10 (2007) ("[W]here, as here, the trial court considered material outside the pleadings, this Court will construe the motion as having been granted pursuant to MCR 2.116(C)(10).").

Additionally, "[t]he applicability of governmental immunity is a question of law that this Court reviews de novo on appeal." *Beals v Michigan*, 497 Mich 363, 369; 871 NW2d 5 (2015). "If the facts are not in dispute and reasonable minds could not differ concerning the legal effect

of those facts, whether the claim is barred by immunity is a question for the court to decide as a matter of law." *Id.* at 370 (quotation marks and citation omitted).

## III. ANALYSIS

The governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, provides "broad immunity from tort liability to governmental agencies and their employees whenever they are engaged in the exercise or discharge of a governmental function." *Beals*, 497 Mich at 370. The exceptions to this general rule provided by the GTLA must be construed narrowly. *Id*.

Specifically applicable in the instant case is MCL 691.1407, which provides in pertinent part as follows:

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

> (3) Subsection (2) does not alter the law of intentional torts as it existed before July 7, 1986.

Furthermore, in *Odom*, our Supreme Court outlined the proper legal framework for courts to apply when a defendant raises individual governmental immunity as an affirmative defense:

> (1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under MCL 691.1407(5).

> (2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.

> (3) If the plaintiff pleaded a negligent tort, proceed under MCL 691.1407(2) and determine if the individual caused an injury or damage while

-6-

acting in the course of employment or service or on behalf of his governmental employer and whether:

> (a) the individual was acting or reasonably believed that he was acting within the scope of his authority,

> (b) the governmental agency was engaged in the exercise or discharge of a governmental function, and

> (c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.

> (4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the *Ross*[1] test by showing the following:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

> (b) the acts were undertaken in good faith, or were not undertaken with malice, and

> (c) the acts were discretionary, as opposed to ministerial. [*Odom*, 482 Mich at 479-480.]

Applying this framework in the instant case, we start by determining whether plaintiff *actually* pleaded an intentional or a negligent tort because there is no dispute that defendant is a lower-ranking governmental employee or official who is not entitled to the absolute immunity provided for in MCL 691.1407(5).[2] *Odom*, 482 Mich at 479. Plaintiff's complaint asserted counts of gross negligence, "assault and battery and false arrest," and intentional infliction of emotional distress. However, although plaintiff purported to assert claims of negligence and

---

[1] *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984). In *Odom*, our Supreme Court noted that *Ross* was the "seminal pre-July 7, 1986, case defining the parameters of governmental immunity for individuals from tort liability," and the *Odom* Court reaffirmed and restated the *Ross* test as the standard for defining the qualified immunity from intentional tort liability provided to governmental employees at common law. *Odom*, 482 Mich at 472-473.

[2] MCL 691.1407(5) provides that a "judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority."

intentional torts, "[a] party's choice of label for a cause of action is not dispositive" and "[w]e are not bound by the choice of label because to do so would exalt form over substance," *Norris v Lincoln Park Police Officers*, 292 Mich App 574, 582; 808 NW2d 578 (2011) (quotation marks and citation omitted). We must instead determine the gravamen of plaintiff's action by considering the claim as a whole and looking beyond the complaint's procedural labels in order to discern the true nature of the claim. *Id*.

Here, all of plaintiff's asserted claims stem from defendant's intentional conduct during plaintiff's arrest. Plaintiff alleged in the complaint that defendant arrested him for reckless driving although it was later demonstrated that plaintiff was not the driver of the vehicle that defendant observed traveling at high speed. The complaint further alleged that defendant assaulted, battered, and used excessive force against plaintiff and that defendant wrongfully arrested plaintiff. Plaintiff's gross negligence count was based on these same allegations regarding defendant's intentional conduct. In other words, plaintiff's gross negligence count was entirely based on the same conduct that plaintiff also alleged constituted intentional torts. The gravamen of plaintiff's claim is clearly that defendant intentionally assaulted him and caused him emotional distress while wrongfully arresting him; thus plaintiff has only alleged claims involving intentional torts. "Elements of intentional torts may not be transformed into gross negligence claims." *Id*. Accordingly the standard for negligent torts in MCL 691.1407(2) is inapplicable to the instant case. *Odom*, 482 Mich at 479-480.

Although plaintiff relies on *Oliver v Smith*, 269 Mich App 560; 715 NW2d 314 (2006), for the proposition that Michigan Courts have recognized gross negligence claims based on excessive tightness of handcuffs causing physical injury, plaintiff's reliance is misplaced. In *Oliver*, this Court held that "a police officer's conduct of handcuffing an individual too tightly does not constitute gross negligence unless physical injury results." *Id*. at 566. However, the *Oliver* Court did not hold that all claims against police officers that involve handcuffs are automatically gross negligence claims. In the instant case, as previously discussed, plaintiff has based his claims against defendant purely on *intentional* rather than negligent conduct and has therefore only asserted claims of intentional torts. *Norris*, 292 Mich App at 582.

Therefore, the trial court erred by denying defendant's motion for summary disposition on plaintiff's gross negligence claim because this count should have been dismissed for failing to state a claim upon which relief could be granted. See *id*.

Next, because plaintiff pleaded intentional torts, we determine whether governmental immunity bars plaintiff's claim by applying the three-part test outlined by the *Odom* Court, which requires defendant to show the following:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

> (b) the acts were undertaken in good faith, or were not undertaken with malice, and

(c) the acts were discretionary, as opposed to ministerial. [*Odom*, 482 Mich at 479-480.]

On appeal, plaintiff does not dispute the first or third prongs of this test. Moreover, with respect to the first part, it is without question that defendant was acting during the course of his employment and within the scope of his authority as a police officer when he conducted a traffic stop and arrest of a driver suspected of driving recklessly at high speed on the shoulder of the highway. Furthermore, "[a] police officer's determination regarding the type of action to take, whether an immediate arrest, the pursuit of a suspect, or the need to wait for backup assistance, constitutes discretionary action entitled to immunity." *Norris*, 292 Mich App at 579. "Discretionary acts require personal deliberation, decision and judgment." *Odom*, 482 Mich at 476. "An officer must use his judgment to determine whether there is reasonable suspicion to investigate or probable cause to arrest and to determine the amount of force necessary to effectuate an arrest." *Id*. Accordingly, we conclude that defendant was also undertaking discretionary acts when he determined that he had probable cause to stop and arrest plaintiff based on his observations.

Therefore, the dispositive issue on appeal, and the one on which the parties clearly disagree, is whether defendant's acts were undertaken in good faith and without malice.

In *Odom*, our Supreme Court stated that a defendant has the burden to establish that he acted in good faith and without malice. *Odom*, 482 Mich at 473, 475. This good-faith element "is subjective in nature" and "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id*. at 481-482. In defining the good-faith prong more comprehensively, the *Odom* Court stated that "a police officer is entitled to immunity when he is acting in good faith with probable cause . . . even though the arrest is subsequently found to be baseless," and the Court also stated that "an action may lie only if the officer has utilized wanton or malicious conduct or demonstrated a reckless indifference to the common dictates of humanity." *Id*. at 474 (quotation marks and citations omitted). "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Id*. at 47 (quotation marks and citation omitted). Finally, in *Odom*, which involved claims of false imprisonment and malicious prosecution, our Supreme Court explained that "[t]he mere existence of probable cause . . . is not the proper inquiry," and a "police officer would be entitled to immunity under *Ross* if he acted in good faith and honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken." *Id*. at 480-481.

This Court's opinion in *Latits v Phillips*, 298 Mich App 109; 826 NW2d 190 (2012), is also instructive for our analysis in the instant case. In *Latits*, the plaintiff, as personal representative of the decedent's estate had filed a complaint that included a claim of assault and battery against the defendant police officer based on the shooting death of the decedent that arose out of the decedent's attempt to flee the police following a traffic stop. *Id*. at 111-113. On appeal from the trial court's denial of the defendant's governmental-immunity-based summary disposition motion, this Court noted: "The substance of plaintiff's argument is that defendant exercised poor judgment or was mistaken about his justification in using deadly force. But even if we were to agree with plaintiff, it would not affect the immunity analysis." *Id*. at 113, 114-

115. The *Latits* Court further stated that "showing that an officer made a mistake does not defeat an immunity defense." *Id*. at 115. This Court held that because the defendant had presented evidence that he was acting in good faith at the time that he shot the decedent, and the plaintiff had not identified any contradictory evidence but had instead focused on whether the use of force was justified, the defendant was entitled to summary disposition on the assault and battery claim on the basis of governmental immunity.[3] *Id*. at 116, 118. The *Latits* Court explained its reasoning as follows:

> Thus, while plaintiff would ultimately have to prove that defendant was not justified in using deadly force in order to prevail at trial on her assault and battery claim, this showing is inadequate to defeat the defense of governmental immunity. As long as defendant can show that he had a good-faith belief that he was acting properly in using deadly force, he is entitled to the protections of governmental immunity regardless of whether he was correct in that belief. And there is no evidence in this case to show that defendant did not have such a belief.
>
> Defendant's stated reason for firing his weapon was to ensure his safety and the safety of others. The facts support the conclusion that defendant would have such a reason, and plaintiff presented no evidence to establish any other motivation. Defendant testified in his deposition that he was informed that Latits had rammed and attempted to ram police cars, that there had been a chase, and Latits had engaged in erratic driving. That defendant actually would have had this belief is supported not only by his own testimony, but by the statements of the other officers involved as recorded in the police reports, about which the officers would presumably testify at trial.
>
> Plaintiff, on the other hand, identifies no evidence supporting a finding of malice. Plaintiff spends a good portion of her argument on this point discussing whether the use of deadly force was justified. But the standard in evaluating the governmental immunity question is not whether, when viewing the facts objectively with the benefit of hindsight, the use of deadly force was justified. Rather, as discussed in *Odom*, 482 Mich at 481, the standard is a subjective one from the perspective of defendant with respect to whether he was acting in good faith. Whether the legal standards for acting in self-defense or defense of others was met is not controlling. Whether the information relayed to defendant by the other officers was accurate is not relevant. What is relevant was whether defendant, in good faith, believed that he needed to fire his weapon to protect himself and others. [*Id*. at 115-116.]

In this case, there is no genuine issue of material fact that defendant acted under a good-faith belief that he had probable cause to stop and arrest plaintiff, even though he later realized that he had made a mistake. The dashboard camera video unmistakably shows a dark colored car

---

[3] We note that the plaintiff in *Latits* had conceded the first and third prongs of the test. *Latits*, 298 Mich App at 114.

traveling at high speed along the right shoulder of I-94 and a police vehicle giving chase a short time later. The parties do not dispute that this car was a Dodge Challenger. The parties also do not dispute that plaintiff was subsequently stopped on I-94 by defendant at a point further down the highway, nor do the parties dispute that plaintiff was driving a dark colored Dodge Challenger. While the two vehicles are different and the video apparently demonstrated these differences sufficiently enough to warrant dismissing the charges against plaintiff, the video also shows the undisputable similarities between the vehicles. Regardless, the record evidence shows that defendant consistently maintained that at the time of the arrest, he was confident that plaintiff's Dodge Challenger was indeed the one that defendant had seen traveling 91 miles per hour on I-94 before stopping plaintiff's vehicle on the same highway. Defendant testified during his deposition that he had no doubt at the time of the arrest that he had arrested the correct driver, and defendant testified that he believed his police report was accurate at the time that he wrote it immediately following the incident. While the good-faith inquiry is subjective, *Odom*, 482 Mich at 481-482, it is worth noting that the video supports, rather than contradicts, defendant's belief that he caught up to the same car that he had seen traveling at 91 miles per hour.

Plaintiff's argument that defendant acted with malice focuses merely on attempting to discredit the reasonableness of defendant's belief that he had the necessary probable cause. Plaintiff takes issue with discrepancies between defendant's police report and his later statements with respect to whether he saw the license plate when he began chasing the speeding car and whether he maintained consistent eye contact with the speeding car. Plaintiff further claims that defendant had no probable cause to stop plaintiff's car once he lost sight of the speeding car for a significant distance and that defendant "fabricated" probable cause in his police report, which evidenced his malice and lack of good faith. However, the relevant inquiry under the governmental immunity question is not whether defendant's belief was justified "when viewing the facts objectively with the benefit of hindsight." *Latits*, 298 Mich App at 116. Moreover, the factual inaccuracies do not have any impact on the analysis of whether defendant, at the time of the arrest, had a good-faith belief that he stopped the correct vehicle because regardless of these inaccuracies, the undisputed evidence shows that defendant saw a dark colored Dodge Challenger traveling at high speed on the shoulder on I-94, that defendant caught up to and stopped a dark colored Dodge Challenger of similar appearance driving on I-94, and that defendant honestly believed that he had stopped the same Dodge Challenger that he saw driving recklessly. In other words, while plaintiff may dispute the precision of defendant's various observations, plaintiff has not pointed to any evidence that contradicts the honesty of defendant's belief that he held at the time of the arrest. There simply is no evidence of wanton or malicious conduct or a demonstrated reckless indifference to the common dictates of humanity. *Odom*, 482 Mich at 474.

Therefore, plaintiff's intentional tort claims are barred by governmental immunity because the fact that he was mistaken about plaintiff being the driver of the speeding car does not negate defendant's good-faith belief at the time of the arrest that he had stopped the correct vehicle. *Odom*, 482 Mich at 480-481; *Latits*, 298 Mich App at 115-116. The trial court erred by denying defendant's motion for summary disposition. *Odom*, 482 Mich at 466. On remand, the trial court is instructed to enter an order granting summary disposition in defendant's favor on all of plaintiff's claims against him.

In light of these conclusions, defendant's remaining arguments are moot because there is no further relief that we can grant to defendant. *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). Accordingly, we decline to address these arguments because an appellate court generally does not decide moot issues. *Id*.

Reversed and remanded to the trial court with instructions to enter an order granting summary disposition in favor of defendant. We do not retain jurisdiction. Defendant, having prevailed, may tax costs. MCR 7.219(A).


/s/ Stephen L. Borrello
/s/ Jonathan Tukel